**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SARAH ALBERG,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Bryan Fields, Assistant United States Attorney for the District of Colorado (the "Government"), and the Defendant, SARAH ALBERG, personally and by and through her counsel, Fredric Winocur and Brian Leedy, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCRR 11.1 and FED. R. CRIM. P. 11(c)(1)(A) and (B):

## I. AGREEMENT

**A.    Defendant's Obligations:**

1.    The Defendant agrees to (1) waive indictment, (2) plead guilty to an Information charging her with introducing a misbranded drug into interstate commerce in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), (3) cooperate with the government as set forth below, and (4) waive her appeal rights, as detailed below.

**COURT EXHIBIT**
**1**

**B.    Government's Obligations**

2.      In exchange for the Defendant's plea of guilty and her waiver of appeal rights, the Government agrees to (1) file no other federal criminal charges against the Defendant arising from the stipulated facts set forth below, (2) except for any downward departure authorized by U.S.S.G. § 5K1.1, not seek a sentence outside the guideline range that applies to an offense level of **6** (or, if the Defendant receives the two level reduction for acceptance of responsibility, to an offense level of **4**), and (3) recommend a two-level level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, provided that the Defendant does not do anything that is inconsistent with accepting responsibility between and including the date of her guilty plea and the date of sentencing.

3.      The Defendant further stipulates and agrees that further proceedings in this matter, including the change of plea hearing and sentencing hearing, cannot be delayed without serious harm to the interests of justice; therefore, such proceedings should be conducted by video teleconference, or by telephone conference if video teleconferencing is not reasonably available, so long as District Court Orders 2020-04, 2020-12, 2020-15 and any substantially similar orders regarding emergency conditions due to the COVID-19 pandemic remain in effect.

**C.    Defendant's Waiver of Appeal**

4.      The Defendant is aware that 18 U.S.C. § 3742 affords a Defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the Government in this agreement, the Defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided

2

in the statute of conviction, (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 6 (or, if the Defendant receives the two-level reduction for acceptance of responsibility, level 4); or (3) the Government appeals the sentence. Except as provided above, the Defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.

5.      The Defendant also knowingly and voluntarily waives her right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. The Defendant specifically waives on appeal or in a collateral attack any argument that the admitted conduct does not fall within the scope of the statute. This waiver provision, however, will not prevent the Defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the Defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the Government appeals the sentence imposed by the Court, the Defendant is released from this waiver provision. Should the plea of guilty be vacated on the motion of the Defendant, the Government shall be released from the first of its obligations above and may, in its sole discretion, move to bring other charges arising from the stipulation of facts set forth below.

**D.      The Defendant's Cooperation Agreement**

6.      The Defendant agrees to provide truthful, complete and accurate information, and agrees to cooperate fully with the Government. The Defendant's full cooperation shall include cooperating with any state and local governments when the Government so requests. Deliberate

falsehoods or misinformation provided during her cooperation with the Government would be grounds for rescission of this plea agreement as well as possible further prosecution for perjury or false statements. This cooperation will include, but is not limited to, the following:

a. The Defendant agrees to be fully debriefed, and to attend all meetings at which her presence is requested, concerning her participation in and knowledge of all criminal activities;

b. The Defendant agrees to furnish to the Government all non-privileged documents and other material that may be relevant to the investigation and that are in the Defendant's possession or control;

c. The Defendant agrees to testify fully and truthfully at any proceeding in the District of Colorado or elsewhere as requested by the Government, including in any state, local or administrative proceeding;

d. The Defendant agrees that she will at all times give complete, truthful and accurate information and testimony and that she will fully and truthfully disclose all information with respect to the activities of herself and others concerning all matters about which the Government inquires;

e. The Defendant consents to postponements of her sentencing, as requested by the Government and as approved by the Court. Should the Defendant be required to provide testimony at a time subsequent to her sentencing in this case and should the Defendant fail, at a later date, to comply with the obligation to testify, the Government could seek to recharge her on any and all counts which were dismissed as part of this plea agreement.

7. The parties understand that the Government's determination of whether the Defendant has cooperated fully and provided substantial assistance and the Government's assessment of the value, truthfulness, completeness, and accuracy of the cooperation, are within the Government's sole discretion. Moreover, the Defendant shall not be entitled to withdraw her plea if the Government determines that she has not fully cooperated. The Defendant's full cooperation, in the form of proffers and testimony, if required, has not yet been completed. The parties understand and agree that the determination of whether or not the Defendant has fully

4

cooperated in compliance with the terms of this plea agreement and whether to file a motion under Section 5K1.1 are entirely within the discretion of the Government.

8.      The parties recognize that any sentence requested by the Government will be a recommendation to the Court and that the Defendant's ultimate sentence will rest solely within the discretion of the sentencing Court.

9.      The Defendant also acknowledges that she will not be able to withdraw her guilty plea in the event that the Court elects not to grant any downward departure pursuant to the request made by the Government or rejects the amount of the departure requested by the Government.

10.     The Defendant may not contest the Government's ultimate determination as to whether a § 5K1.1 motion is appropriate in this case. The Government has not promised a reduction or the amount of any reduction. Again, the Defendant understands she will not receive any reduction if she refuses to provide complete and true information to the Government and to testify truthfully in any proceeding.

## II. ELEMENTS OF THE OFFENSE

11.     The parties agree that the elements of the offense of introducing an misbranded drug into interstate commerce, a violation of 21 U.S.C. §§ 331(a), 333(a)(2), are follows:

a.      *First,* that the Defendant introduced HCG into interstate commerce;

b.      *Second*, that HCG was a "drug";

c.      *Third,* that the HCG was misbranded in at least one way;

d.      *Fourth*, the Defendant acted with an intent to defraud or mislead when she introduced HCG products into interstate commerce.[1]

---

[1] *See* Charge of the Honorable Rosanna Malouf Peterson, *United States v. Smith*, 2:13-cr-

## III. <u>STATUTORY PENALTIES</u>

12.      The maximum statutory penalties for the violation above are not more than 3 years' imprisonment; a fine of not more than $250,000; not more than 1 year of supervised release; and a $100 special assessment. If probation or supervised release is imposed, the Court may order restitution as a condition of probation or supervised release. The Government agrees that it will not seek an order of restitution as it is not warranted in this matter.

13.      If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. <u>COLLATERAL CONSEQUENCES</u>

14.      The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. <u>STIPULATION OF FACTS</u>

15.      The parties agree that there is a factual basis for the guilty plea that the Defendant will tender pursuant to this Plea Agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the

---

00014-RMP, ECF No. 682 (E.D. Wa. May 26, 2015).

execution of this Plea Agreement.

16.     This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree as follows:

17.     The relevant conduct in this case began in 2004 and ended in May 2020. Unless otherwise stated, the conduct below took place in Douglas County, Colorado, which is in the State and District of Colorado.

**Background I:   The Regulation of Drugs by the Food and Drug Administration (the "FDA")**

18.     The United States Food and Drug Administration ("FDA") is the federal agency responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), by ensuring that drugs intended for use in humans are safe and effective for their intended uses, and by ensuring that the labeling of such drugs bear true and accurate information. Pursuant to that responsibility, the FDA published and administered regulations relating to the approval, manufacture, labeling and distribution of drugs.

19.     The FDCA defines "drug" as, among other things, (a) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, 21 U.S.C. § 321(g)(1)(B); (b) articles (other than food) intended to affect the structure or function of the body of man or other animals, 21 U.S.C. § 321(g)(1)(C); and (c) articles intended for use as a component of any articles specified in (a) or (b), 21 U.S.C. § 321(g)(1)(D). The "intended use" is

based on the objective intent of the person responsible for the labeling, including the circumstances surrounding the distribution of the article. 21 C.F.R. § 201.128.

20.     A "new drug" is any drug which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs as safe and effective for use under the conditions prescribed, recommended, or suggested in that drug's labeling. 21 U.S.C. § 321(p)(1). Before any "new drug" can be lawfully introduced or delivered for introduction into interstate commerce, it must be the subject of an approved New Drug Application (NDA) or Abbreviated New Drug Application (ANDA), or is exempt pursuant to an approved Investigational New Drug Application (IND). 21 U.S.C. § 355. The FDCA makes it a crime to introduce or deliver for introduction an unapproved new drug into interstate commerce. 21 U.S.C. § 331(d).

21.     A "label" under the FDCA is a display of written, printed, or graphic material upon the immediate container of any article. 21 U.S.C. § 321(k). The verb "labeling" under the FDCA is broader and includes all labels and other written, printed or graphic matter upon any article, including drugs, or on any of its containers or wrappers, or accompanying any such article. 21 U.S.C. § 321(m).

22.     Every person, upon first engaging in the manufacture, preparation, propagation, compounding, or processing of a drug or drugs in any establishment which he owns or operates in any State, is required to immediately register the name of such person, place of business of such person, all such establishments, the unique facility identifier of each establishment, and a point of contact email address.   21 U.S.C. § 360(b)(1) and (c).

23.     The terms "manufacture, preparation, propagation, compounding, and processing"

include repackaging or otherwise changing the container, wrapper, or labeling of any drug package in furtherance of the distribution of the drug from the original place of manufacturer to the person who makes final delivery or sale to the ultimate consumer or user. 21 U.S.C. § 360(a)(1).

24.     The failure to register in accordance with 21 U.S.C. § 360 is a prohibited act under the FDCA. 21 U.S.C. § 331(p).

25.     The FDCA prohibits the introduction or delivery for introduction, or causing the introduction or delivery for introduction, into interstate commerce of any drug that is misbranded or adulterated. 21 U.S.C. § 331(a).

26.     A drug can be misbranded under the FDCA in many different ways, including but not limited to:

    a.     If its labeling is false or misleading in any particular, 21 U.S.C. § 352(a);

    b.     If its labeling did not bear the name and place of business of the manufacturer, packer, or distributor, including the street address, city and zip code, 21 U.S.C. § 352(b), 21 C.F.R. § 201.1(i); or

    c.     If it was manufactured, prepared, propagated, compounded, or processed in any establishment in any State not duly registered with the Secretary of Health and Human Services pursuant to 21 U.S.C. § 360, 21 U.S.C. § 352(o).

27.     A drug is adulterated if, among other things:

    a.     It is prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health, 21 U.S.C. § 351(a)(2)(A), or

b.      The methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice (CGMP) to assure that the drug meets the requirements of the FDCA. 21 U.S.C. § 351(a)(2)(B). The failure to comply with any CGMP regulation set forth in 21 C.F.R. Part 210 or 211 in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under 21 U.S.C. § 351(a)(2)(B). 21 C.F.R § 210.1.

28.      Manufacturing processes include packaging and labeling operations. 21 C.F.R. § 210.3(12).

29.      Minimum CGMPs for drugs require, among other things, procedures to ensure that the containers, closures, packaging material and drugs were safe, and that labeling is adequate and free from error. 21 C.F.R. § 211.80-211.94; 21 C.F.R. § 211.122-137. CGMPs also require companies to keep accurate, complete, and contemporaneous records of the packaging, labeling and distribution process to that the companies and FDA can monitor the conduct of company processes and employees throughout the packaging, labeling, and distribution process and can evaluate the integrity of the shipped products. 21 C.F.R. § 211.180-198. Moreover, the CGMP process mandates that companies have in place a quality control unit, governed by written procedures, with responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products. 21 C.F.R. § 211.22.

**Background II:   Importing Drugs Into the United States**

30.      Federal law requires that, among other things, all articles brought into the United

States by any individual (1) be declared to a Customs officer at the port of first arrival in the United States; (2) be declared on a conveyance en route to the United States on which a Customs officer was assigned for that purpose; or (3) be declared at a pre-clearance officer in a foreign country where a United States Customs officer was stationed for that purpose. 19 C.F.R. § 148.11

      31.     When a drug falling under the jurisdiction of the FDA is declared or offered for import into the United States, United States Customs and Border Protection notifies the FDA to determine whether the drug should be sampled and whether importation of the drug is lawful under the FDCA. *See* 21 U.S.C. § 381.

### Background III:   The Controlled Substances Act

      32.     The Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States. The Controlled Substances Act defines a "controlled substance" as a drug or other substance included within one of five schedules. 21 U.S.C. §802(6).

      33.     Drugs are placed into these schedules based on their potential for abuse, among other things. Schedule III controlled substances have a potential for abuse that is less than substances in Schedules I and II and risk moderate or low physical dependence or high psychological dependence; Schedule IV controlled substances have a low potential for abuse and a low risk of dependence. 21 U.S.C. §812. Phendimetrazine is a Schedule III controlled substance. 21 C.F.R. § 1308.13(b)(5). Phentermine is a Schedule IV controlled substance. 21 C.F.R. § 1308.14(f)(9).

34.     A controlled substance can only be distributed, dispensed, or possessed with the intent to manufacture, distribute or dispense if it is authorized by the Controlled Substances Act. 21 U.S.C. § 841(a) For example, a licensed medical practitioner can prescribe a controlled substance such as oxycodone only if the practitioner is authorized to do so under a license issued by the Drug Enforcement Administration ("DEA") and only if the prescription is written for a legitimate medical purpose and is within the usual course of medical practice. 21 C.F.R. §§ 1306.03-04.

35.     The Defendant stipulates that she was not a medical practitioner and was not otherwise authorized to distribute any controlled substance, including phendimetrazine and phentermine.

**The Defendant's Illegal Drug Business**

36.     Human chorionic gonadotropin (HCG) is a hormone produced by the human placenta and found in the urine of pregnant women. HCG is FDA-approved for the treatment of select cases of female infertility and hormone treatment in men. FDA-approved HCG products are only available in injection-form and require a prescription from a licensed medical professional. *See FDA's Questions and Answers on HCG Product for Weight Loss, https://www.fda.gov/drugs/medication-health-fraud/questions-and-answers-hcg-products-weight-loss#:~:text=HCG%20is%20FDA-approved%20for%20the%20treatment%20of%20select,are%20no%20FDA-approved%20HCG%20products%20for%20weight%20loss.*

37.     HCG is not approved for use without a prescription for any purpose, and there are no FDA-approved HCG products for weight loss. *See Avoid Dangerous HCG Diet Products* https://www.fda.gov/consumers/consumer-updates/avoid-dangerous-hcg-diet-products (current

as of 7/13/20) ("HCG Consumer Alert).

38.     In fact, the HCG prescription drug label notes that there "is no substantial evidence that it increases weight loss beyond that resulting from caloric restriction, that it causes a more attractive or 'normal' distribution of fat, or that it decreases the hunger and discomfort associated with calorie-restricted diets." HCG Consumer Alert.

39.     The FDA has advised consumers to avoid HCG weight loss products, which are typically sold in the form of oral drops, pellets, and sprays. *See* HCG Consumer Alert. In this consumer alert, FDA stated that products marketed for weight loss that claim to contain HCG are typically marketed in connection with a very low-calorie diet, which is "not only unhealthy but also dangerous."   While such diets are sometimes prescribed by health care professionals for people who are moderately to extremely obese as a part of medical treatment, they are done so under strict and constant medical supervision to ensure that side effects are not life-threatening.

40.     FDA has received reports of serious adverse events associated with the use of HCG injections for weight loss including cases of pulmonary embolism, depression, cerebrovascular issues, cardiac arrest, and death.

41.     HCG is a protein, which means that it breaks down into its constituent amino acids when a person takes it orally. There is no evidence that HCG can actually be absorbed into the human body when it taken by mouth.

42.     As set forth in more detail below, between approximately 2004 and 2010 and again between 2011 and 2020, the Defendant introduced and delivered, or aided and abetted in the introduction and delivery of, a misbranded, adulterated, and unapproved new drug into interstate commerce. The drug — sold under the trade names "Releana," "Trileana," and

TrimContour," — was marketed by the Defendant, or with her help, as an oral HCG treatment for weight loss and its labeling included instructions related to a very low calorie diet. No matter the formulation of its liquid component, which changed through the years, these HCG drugs were misbranded because they were not manufactured, prepared, propagated, compounded, or processed in any establishment registered with the Secretary of Health and Human Services. These drugs were also unapproved new drugs because they were never the subject of an approved NDA or ANDA for their intended use in weight loss and were not exempt as an approved IND.

43.     The TrimContour drug product was also misbranded for the following reasons:

a.     It was misbranded because its labeling was false and misleading. Among other things, the labeling stated that the product was "made in the USA."  It was not. The Defendant obtained the HCG by smuggling it in from other countries like Canada and India.

b.     It was misbranded because its labeling did not bear the name and place of business of the manufacturer, packer, or distributor, which was the Defendant at her personal residence. Instead, it gave an address for an office maintained by INDIVIDUAL 1, whose identity is known to the parties.

c.   It was misbranded because it was not manufactured, prepared, propagated, compounded, or processed in any establishment in any State duly registered with the Secretary of Health and Human Services.

44.     HCG distributed under the Trim Contour brand was also adulterated in several respects. First, the drug was prepared, packed, and held in insanitary conditions. The Defendant maintained bottles and supplies used to make and distribute the drug in her garage, where they

14

were exposed to mice feces. Second, the methods used to manufacture, process, pack and hold the drugs were not in conformity with CGMP standards.

45.     The Defendant first became involved in the distribution of HCG drugs in approximately 2004 when she began working for INDIVIDUAL 1. That year, INDIVIDUAL 1 began offering HCG injections for weight loss. In approximately 2005, INDIVIDUAL 1 developed the Releana product, which purported to offer consumers the ability to take HCG through sub-lingual drops. The product was sold to doctors' offices, which then sold it to consumers. The Defendant stopped working for INDIVIDUAL 1 in approximately late 2007. The Defendant purchased a medical spa from INDIVIDUAL 1 in late 2008, but the business relationship between the Defendant and INDIVIDUAL 1 soured and INDIVIDUAL 1 took the spa back.

46.     On February 10, 2010, the Defendant contacted an FDA-OCI Special Agent to report that INDIVIDUAL 1 was violating the FDCA. The Defendant reported that, in 2006, INDIVIDUAL 1 was manufacturing the Releana product at a medical spa. The product was being marketed for weight loss and sold to doctors' offices. As part of her complaint to the FDA, the Defendant provided a vial of the HCG and a vial of the compounding solution used to create the Releana product.

47.     The Defendant went back to work for INDIVIDUAL 1 in 2011, where she performed marketing for the medical spa and other tasks related to the distribution of the Releana product.

48.     INDIVIDUAL 1 filed for bankruptcy on January 10, 2013. Among the assets listed in the bankruptcy was the patent and associated trademark for the Releana product. As part

of the bankruptcy, those assets were sold to INDIVIDUAL 2, whose identity is known to the parties, on or about April 3, 2015.

49.     After the bankruptcy, INDIVIDUAL 1 created the Trileana product, a misbranded and unapproved new drug marketed for weight loss.

50.     In 2015 the Defendant and INDIVIDUAL 1 were sued by Releanna, LLC, the new patent holder, for willful patent infringement. In June 2017 a judge sitting in the United States District Court for the Northern District of Georgia entered judgment against the Defendant and INDIVIDUAL 1.

51.     As a result of the lawsuit, the Defendant and INDIVIDUAL 1 created the Trim Contour product.

52.     INDIVIDUAL 1 died in January 2019. The Defendant obtained INDIVIDUAL 1's inventory of HCG products, including Trileana and TrimContour. The inventory also included a large amount of amphetamines.

53.     The Defendant took steps to expand and grow the HCG business. Between approximately January 2018 and May 2020, she marketed TrimContour as a weight loss drug by creating and maintaining the website www.trimocontour.com, which made the statements described above in paragraph 35(b). The Defendant sold the TrimContour product to doctors and to individual consumers and introduced, delivered and caused the introduction and delivery of TrimContour in interstate commerce. She also distributed Phendimetrazine and Phentermine.

54.     In approximately March 2018 the HCG inventory ran out. At that point, the Defendant used INDIVIDUAL 1's records to obtain HCG powder from a Canadian company, the identity of which is known to the parties. Because the Canadian company would not send the

HCG to a residence, the Defendant had it sent to INDIVIDUAL 1's old office and then re-sent, from there, to her residence in Colorado.   The Defendant then used that powder to manufacture the TrimContour product at her kitchen table.

55.     In December 2019 the Defendant ordered HCG powder from an Indian company, the identity of which is known to the parties. The HCG powder was shipped directly from India to the Defendant's residence in a package with a Customs Declaration that falsely declared its contents. The Defendant knew that it was illegal to obtain HCG this way.

56.     On February 5, 2020, an FDA-OCI agent acting in an undercover capacity, emailed the Defendant, who was using the email address info@trimcontour.com. The undercover agent asked the Defendant if her products were approved by the FDA and if the products are made in the United States. The Defendant replied and stated, "The product is not approved by the FDA for weight loss-which is common with weight loss products or any supplement that you can buy."   She also stated "the product is manufactured in the United States."   The Defendant went on to say that her HCG Weight Drops are her best product and you can expect one pound of weight loss per day. She told the undercover that the cost for a one-month supply was $250.

57.     On February 14, 2020, an FDA-OCI agent acting in an undercover capacity ("Undercover Agent 1") consensually recorded a call received from the Defendant. During the call Undercover Agent 1 ordered a one-month supply of the TrimCountour Weight Loss Drops for $250. Undercover Agent 1 requested that the order be shipped to an undercover address in Mission, Kansas. The Defendant described the TrimContour product as a hormone that is used by women during pregnancy to break down fat reserves to give to the fetus. She further explained that when the product is used with a low-calorie diet, it has the same effect as breaking

17

down fat and providing it to the body for energy and food, thus having the ability to lose weight without feeling hungry. During the recorded phone call, the Defendant did not ask any medical history questions.

58.    On February 14, 2020, Undercover Agent 1 received an email with verification that the package from TrimContour (USPS tracking# 9405 5112 9837 0546 7107 86) had been mailed from Highlands Ranch, Colorado to Mission, Kansas. On the same date, Undercover Agent 1 received an email from the Defendant that had the TrimContour "Information Packet" attached. The Information Packet contained directions for using the TrimContour Weight Loss Drops and a nutrition guide describing a dangerous low-calorie diet.

59.    The Defendant stipulates and agrees that the TrimContour was misbranded for all of the reasons set forth in paragraphs 36(a)-(c), that it was adulterated for the reasons set forth in paragraph 37(a) – (b), and that it was an unapproved new drug.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

60.    The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

61.    The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. Although the government is obligated not to recommend any sentence above

the range tied to an offense level of 6 (or 4, if the Defendant accepts responsibility), as set forth in Section I above, the parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may make legal or factual arguments that affect the estimate below.

A.      Pursuant to U.S.S.G. § 2N2.1(a), the base offense level is 6. The parties stipulate and agree that none of the cross-references in § 2N2.1(c) apply.

B.      <u>Acceptance of Responsibility</u>:   Provided the Defendant does nothing inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the Defendant should receive a 2-level downward adjustment, pursuant to U.S.S.G §§ 3E.1.1(a). The resulting Offense Level would be **4.**

C.      <u>Criminal History Category</u>: The parties understand that the Defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the Defendant's prior convictions. Based on information currently available to the parties, it is estimated that the Defendant's criminal history category would be **Category II**.

D.      Assuming the (tentative) criminal history set forth above, the career offender/criminal livelihood/armed career criminal adjustments pursuant to U.S.S.G. § 4B1.1 - § 4B1.4 would not apply.

E.      <u>Imprisonment</u>:   The advisory guideline range resulting from these calculations — an offense level of 4 at Criminal History Category II — is 0 to 6 months of imprisonment. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level of 4 set forth above could conceivably result in a range from 0 months (bottom of Category I), to 12 months (top of Category VI).

F.      Fine: The Government will not seek a fine in this case. However, the parties understand that pursuant to U.S.S.G. § 5E1.2, assuming the estimated offense level of 4 set forth above, the fine range for this offense would be $500 to $9,500, plus applicable interest and penalties and the Court may impose a fine.

G.      Supervised Release: Pursuant to U.S.S.G. § 5D1.2, if the Court imposes a term of supervised release, that term is one year.

H.      Restitution: The parties understand that, while the Government is not seeking restitution in this matter, pursuant to 18 U.S.C. §§ 3563(b) and 3583(d), the Court may impose restitution as a condition of probation or supervised release in an amount to be determined by the Court.

62.      The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

63.      No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes the Defendant from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

64.      The parties understand that the Court is free, upon consideration and proper

application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VI.   ENTIRE AGREEMENT

65.    This Plea Agreement states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, Government nor the Defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date:  12/29/20                          s/ Sarah Alberg
                                         SARAH ALBERG
                                         Defendant

Date:                                    _____
                                         Fredric Winocur, Esq.
                                         Attorney for Defendant

Date:  12/29/20                          Brian Leedy
                                         Brian Leedy, Esq.
                                         Attorney for Defendant

Date:                                    _____
                                         Bryan David Fields
                                         Assistant United States Attorney

21